IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

S. W., S. G., Ca. R., Ch. R., D. R.,
P. F., A. F., R. W., E. W., S. B. and
N. B.,

                Plaintiffs,

    v.

TONY EVERS, STATE OF WISCONSIN
DEPARTMENT OF PUBLIC INSTITUTION,
ELKHORN AREA SCHOOL DISTRICT,
GREENDALE SCHOOL DISTRICT,
MUSKEGO-NORWAY SCHOOL DISTRICT,
SHOREWOOD SCHOOL DISTRICT and
PARIS J1 SCHOOL DISTRICT,

                Defendants.

OPINION AND ORDER

14-cv-792-wmc

---

In this civil action, the plaintiffs are children with disabilities who seek to open enroll as non-residents in one of the school districts named as defendants, as well as their parents. Plaintiffs allege that Wisconsin's Open Enrollment Law, Wis. Stat. § 118.51, blocks their enrollment in violation of Title II of the Americans with Disability Act, 42 U.S.C. § 12132, the Rehabilitation Act, 29 U.S.C. § 794(a), and the Equal Protection Clause of the United States Constitution. Before the court are the parties' cross-motions for summary judgment, on which the court already heard oral argument. For the reasons that follow, the court will now grant summary judgment to defendants on plaintiffs' challenges to the Open Enrollment Law under both the ADA and Rehabilitation Act. As for plaintiffs' individual, as-applied challenges, the court will also grant summary judgment to the school district defendants, save one -- R.W.'s claim against the Paris School District. Finally, the court will grant summary judgment to defendants on

plaintiffs' Equal Protection claims. Accordingly, only R.W.'s ADA and Rehabilitation claim will proceed to a bench trial.

## UNDISPUTED FACTS

### A. Challenged Statute

Plaintiffs challenge Wisconsin's Open Enrollment Law, which provides in pertinent part:

> (5) Nonresident school district acceptance criteria.
>
> (a) Permissible criteria. Except as provided in sub. (3)(a)2., the criteria for accepting and rejecting applications from nonresident pupils under subs. (3)(a) and (3m)(a) may include only the following:
>
> 1. The availability of space in the schools, programs, classes, or grades within the nonresident school district. The nonresident school board shall determine the number of regular education and special education spaces available within the school district in the January meeting of the school board . . . In determining the availability of space, the nonresident school board may consider criteria such as class size limits, pupil-teacher ratios, or enrollment projections established by the nonresident school board and may include in its count of occupied spaces all of the following:
>
> a. Pupils attending the school district for whom tuition is paid under s. 121.78(1)(a).
>
> b. Pupils and siblings of pupils who have applied under sub. (3)(a) or (3m)(a) and are already attending the nonresident school district.
>
> c. If the nonresident school district is a union high school district, pupils who have applied under sub. (3)(a) or (3m)(a) and are currently attending an underlying elementary school district of the nonresident school district under this section.

2. Whether the pupil has been expelled from school by any school district during the current or 2 preceding school years for any of the following reasons or whether a disciplinary proceeding involving the pupil . . .

3. Whether the nonresident school board determined that the pupil was habitually truant from the nonresident school district during any semester of attendance at the nonresident school district in the current or previous school year.

**4. Whether the special education or related services described in the child's individualized education program under s. 115.787(2) are available in the nonresident school district or whether there is space available to provide the special education or related services identified in the child's individualized education program, including any class size limits, pupil--teacher ratios or enrollment projections established by the nonresident school board.**

6. Whether the child has been referred to his or her resident school board under s. 115.777 (1) or identified by his or her resident school board under s. 115.77 (1m)(a) but not yet evaluated by an individualized education program team appointed by his or her resident school board under s. 115.78 (1).

Wis. Stat. § 118.51(5)(a).[1]

Of course, the parties' focus in this case is primarily on the bolded criteria #4, which expressly allows school districts to consider the availability of specific service or space needs set forth in a non-resident child's "individualized education plan" or "IEP."[2]

The parties' submissions provide additional detail on the process for applying for open enrollment, including the role of defendant State of Wisconsin Department of Public Instruction in that process. The court need not recount these facts in detail, other

---

[1] Section 118.51(5)(a) has no subpart 5.

[2] In fairness, criteria #1 also allows consideration of a district's "space," specifically including "special education space," albeit not on an individualized basis.

than to note that the intent of the Open Enrollment Program is to be cost neutral by requiring a child's resident district to pay "tuition" to a nonresident district who accepts that child for admission. This is done through an adjustment to the state aid awarded both the resident and non-resident district, with state aid to the nonresident school district increased by an equal amount to the decrease in aid to the resident school district. *See* Wis. Stat. § 118.51(16). As an example, the state provided $6,635 in aid per student for the 2014-15 school year. If the student has a disability, the non-resident school district determines the additional cost of providing services to the student and adds that amount to the tuition.[3] Wis. Stat. § 118.51(17); *see also* Wis. Stat. § 118.51(12)(b) (providing that a resident district may deny an application to leave that resident district based on a determination that the estimated cost will cause an "undue financial burden" on the resident district.").

### B. The Parties

Along with their respective parents, plaintiffs consist of six children, two of whom are sisters. Plaintiffs contend that one of the named school districts denied each child the opportunity to open enroll as a non-resident student because of a disability. Plaintiffs have also named the State of Wisconsin Department of Public Instruction ("DPI") and Wisconsin Superintendent Tony Evers in his official capacity. For ease of reference, the court organizes the undisputed facts by child and the accused school district.

---

[3] As counsel for the state advised the court at oral argument, the amount a nonresident school district can receive for a student is capped at $12,000 starting with the 2016-17 school year.

### i. R.W. and the Paris School District

Plaintiff R.W. resides in the Kenosha Unified School District and has autism. Plaintiff R.W. and his identical twin brother sought to open enroll in the Paris School District. Paris is a small, rural school district comprised of one school building that houses 280 students, comprising all K-8 students for the entire district. Going into the 2012-2013 school year, Paris had one full-time special education teacher and one full-time special education aide. Also going into that school year, Paris expected 35 students with IEPs, each of whom require varying levels of special education services based on their particular disabilities. For the 2012-2013 school year, open enrollment spaces were determined at a School Board meeting held on November 28, 2011. Paris concluded that "there were no seats available in special education, but there was space available in the incoming general education kindergarten class." (M-N & Paris's PFOFs (dkt. #75) ¶ 34.)

At the time R.W.'s parents submitted his application, he did not have a formal IEP in place. Accordingly, the box on his application form asking whether the child had an IEP was checked "no." RW and his twin brother were both accepted. R.W. attended a kindergarten screening on or about May 16, 2012, at which time, his mother disclosed that R.W. was autistic. Paris's School Administrator Roger Gahart then informed R.W.'s mother that Paris did not have space for him in its special education program.

The parties dispute whether Gahart told R.W.'s mother that the Paris School District would have rejected his application had R.W.'s autism diagnosis been disclosed on the application, and whether Gahart told her that Paris does not accept open

enrollment applications from children with disabilities. (Pls.' Resp. to M-N & Paris's PFOFs (dkt. #98) ¶¶ 44-45.) Moreover, while informing R.W.'s mother that there was no space for him, the school district apparently never formally revoked R.W.'s acceptance, choosing instead to wait for the results of the IEP.

As R.W.'s resident district, the Oshkosh Unified School District did end up evaluating him for an IEP. The resulting report set forth various requirements for therapy and other services, concluding that R.W. should be placed in a "kindergarten classroom that is collaboratively taught by a general education and special education teacher." (Gahart Decl., Ex. E (dkt. #77-5) 9.) Paris's special education teacher reviewed the report and IEP, and then confirmed that the Paris School District did not have space in its special education program to implement R.W.'s IEP. While plaintiffs purport to dispute that the special education teacher reached this opinion, based on that same teacher telling R.W.'s mother's that she was excited to work with R.W. *and* believed there was room for him (Pls.' Resp. to M-N & Paris's PFOFs (dkt. #98) ¶ 590), there is no dispute that to meet R.W.'s IEP, the school district would have had to hire a part-time special education teacher and a part-time aide to work with R.W. on a one-on-one basis, as well as contract for occupational therapy services.

### ii.    P.F. and the Muskego-Norway School District

Plaintiff P.F. resides in the Racine Unified School District, but has applied to a number of nonresident schools over some five years, having been rejected 11 times, including most recently by defendant Muskego-Norway School District as a sixth grader for the 2014-15 school year. P.F. also has autism.

At the end of 2013, Muksego-Norway audited its enrollment numbers and determined that it had 50 seats available in its general education program for the 2014-2015 school year, including 6 seats for sixth grade, but *no* available spaces in its "special education program." (M-N and Paris's PFOFs (dkt. #75) ¶ 10.) The Board approved these numbers at its January 2014 meeting.

P.F.'s application for open enrollment to Muskego-Norway's sixth grade class for the 2014-2015 school year disclosed that he currently received special education services and had an IEP in place. (Thompson Decl., Ex. B (dkt. #76-2).) P.F.'s resident school district in Racine forwarded a copy of that IEP to Muskego-Norway. Among other things, the IEP disclosed that P.F. was diagnosed with autism, had the cognitive and motor functioning of a 2- to 3-year old, is not fully toilet trained, requires frequent sensory breaks, and needs close adult supervision throughout the day, as well as that his "removal from the general education classroom is necessary." (Thompson Decl., Ex. C (dkt. #76-3).) Critical to P.F.'s application, the IEP also required "personal bus transportation for P.F.'s safety, due to the severity of the disability." (*Id.*)

After analyzing P.F.'s IEP, the Muskego-Norway School District completed an open enrollment special education cost estimate and invoice, which found that the total additional cost to educate P.F. would be $50,382, the bulk of which was due to special transportation needs ($41,400 per year alone) between P.F.'s home in Racine and the school in the Muskego-Norway district. Given the amount of this estimate and invoice, the Racine Unified School District decided to disallow the transfer because of the undue financial burden on its school district. Despite *Racine* rejecting the transfer after receiving

its analysis, however, Muskego-Norward informed P.F.'s parents that his application was rejected because "[s]pace is not available in the special education or related services required in your child's individuals education program (IEP). [Wis. Stats. § 118.51(5) (a) 4.]" (A.F.'s Decl., Ex. C (dkt. #38-3).)

### iii. S.W. and the Elkhorn School District

Plaintiff S.W. lives in Wauwatosa. Like the first two plaintiffs discussed above, S.W. has autism. In 2014, S.W. sought open enrollment from three non-resident school districts, including defendant Elkhorn School District. He was rejected by all three.

For the 2014-2015 school year, Elkhorn School District's Board accepted the recommendation of the District Administrator Jason Tadlock not to cap the number of spaces available for the 2014-2015 school year. The DPI Open Enrollment Application Log shows that Elkhorn received 142 applications for open enrollment and accepted 139 -- one application was denied because of an earlier expulsion and two were denied because they were incomplete. S.W.'s application apparently was counted as an accepted application.

The application itself indicated that (1) S.W. received special education services and (2) he had an IEP in place. (Essman Decl., Ex. A (dkt. #47-1).) The application also indicates that S.W.'s "preferred program" was "Lakeland School (for special needs)," and it checked "yes" in response to the question, "Limit to specific school and/or program listed above?" (*Id.*) Lakeland School is a self-contained facility that offers special education services for all school districts within Walworth County. Elkhorn does *not* control or determine Lakeland School's space or student placement capacities.

After receiving S.W.'s application in May 2014, Elkhorn requested that S.W.'s resident district send his IEP in order to prepare a cost estimate. At the same time, Elkhorn reached out to Lakeland to seek assistance in preparing a tuition estimate. Lakeland responded that it did "not know if there will be room in that program or not." (Van Dyke Decl., Ex. C (dkt. #52-3).) Based on that, an Elkhorn School District administrator reached out to Administrator Tadlock to determine whether Elkhorn should send the estimate and place S.W. on a waitlist or deny his application based on space. Tadlock responded that Elkhorn should send S.W.'s resident district an estimate, place him on the waitlist, and inform the family that he was on a waitlist and the timeframe for a decision.

In communicating this plan, Tadlock intended -- consistent with the district plan not to cap enrollment that year -- for S.W.'s application for open enrollment to be accepted, but that he would be placed on a waitlist for Lakeland. Nonetheless, the Elkhorn administrator prepared a letter dated May 20, 2014, stating that S.W.'s open enrollment application was denied based on § 118.51(4)(a)(4) but that he had placed on a waitlist for special education services. Tadlock signed that letter, although he represents that he did not intend for the school district to deny S.W.'s application. Consistent with Tadlock's stated intent, moreover, the District's entry into DPI's Open Enrollment Application Log reflects that S.W.'s application was accepted.

On November 20, 2014, upon learning that Elkhorn was named as a defendant for a denial in 2014, Tadlock reports being surprised because, in his view, the district had not denied anyone a spot in 2014. Only after the email exchange with his assistant, who

he asked to review S.W.'s application, does Tadlock report discovering the misunderstanding over which waitlist S.W.'s application belonged -- the one for the District as a whole versus one for Lakeland school specifically. The next day, Tadlock sent S.W.'s parents an email explaining the District's error and offering "to accept an open enrollment exception application, arrange for an IEP meeting to determine placement, and put in place the services needed." (Tadlock Decl., Ex. G (dkt. #49-7).) Counsel for plaintiff responded to Tadlock's email, explaining that "[b]ecause litigation was pending, it would be inappropriate for us to deal with Mr. Tadlock but I would be happy to talk with Elkhorn's counsel if Mr. Tadlock would have that attorney contact me." (McGrath Decl. (dkt. #104) ¶ 11.) S.W. did not enroll, and there was no further communication.

### iv.    S.B. and the Shorewood School District

Plaintiff S.B. lives in Milwaukee and was diagnosed with ADHD in 2010. On June 3, 2014, S.B.'s mother withdrew her consent for S.B. to receive all special education and related services in the district where he resides, although plaintiffs maintain that she made this decision because she was dissatisfied with the services S.B. received in his resident district. She then sought to open enroll S.B. into the Shorewood School District for the 2014-2015 school year.

On the application, his mother indicated that S.B. did not currently receive special education services and did not have an IEP. (Nicholas Decl., Ex. A (dkt. #67-1).) On May 27, 2014, S.B.'s open enrollment application was accepted for the 2014-15 school year by Shorewood.

On October 8, 2014, S.B.'s open enrollment acceptance at Shorewood was revoked because of his special education need. Wis. Stat. § 118.51(5)(a)(4). On December 17, 2014, DPI overturned Shorewood's revocation, specifically finding that S.B. "is no longer entitled to receive special education." (Nicholas Decl., Ex. C (dkt. #67-3).) Shorewood asserts that it has never refused to enroll S.B. since D.P.I.'s decision, and it remains willing to do so.

In particular, Shorewood maintains that on January 28, 2015, a Shorewood administrator called S.B.'s mother and left her a message about the process for registering and re-enrolling to attend school during the spring semester of 2015. In response, however, S.B.'s mother represents that she never received such a voicemail. To the contrary, she reports filling out a written form provided to her by DPI within a week of its December 17th decision, as well as following up with phone calls, but receiving no response until a May 11, 2015, letter sent to plaintiffs' counsel. (Pollard Decl., Ex. A (dkt. #69-1).)

Plaintiffs further contend that the proposed terms in that May 11th letter were not acceptable, because Shorewood purported to impose "conditions and burdens on S.B. that were not imposed on other students." (Pls.' Resp. to Shorewood's PFOFs (dkt. #96) ¶ 8.) In fact, the letter simply references D.P.I.'s December 17, 2015, decision and offers of enrollment without any "conditions." (Pollard Decl., Ex. A (dkt. #69-1).) Moreover, on August 6, 2015, Shorewood sent another letter to S.B.'s mother advising her that Shorewood remained willing to enroll S.B. for the 2015-16 school year. (Nicholas Decl.,

Ex. D (dkt. #67-4).) S.B.'s mother also did not respond to this offer, and S.B. attended a non-Shorewood school for the 2015-2016 school year.

### v. Ca.R. and Ch.R. and the Greendale School District

Finally, sisters Ca.R. and Ch.R. reside in Milwaukee. Both have been diagnosed with autism. In 2014, their mother filed applications on their behalf to two school districts under the Open Enrollment Program, including defendant Greendale School District. Ch.R. applied to enroll in fifth grade, while Ca.R. applied to enroll in seventh grade. Both Ca.R.'s and Ch.R.'s applications also indicated that they received special education services and that each had IEPs in place.

For the 2014-15 school year, Greendale determined that there were open enrollment spaces available in grades four, eight, nine and twelve, but denied all applications for open enrollment into fifth and seventh grade. In a letter to their parents, the District explained that Ca.R. and Ch.R. were denied space both because there was no space in the regular education program for fifth and seventh grades, *and* because the District did not have space in the special education programs or related services required under the students' IEPs. (McHugh-Moore Decl., Exs. D, E (dkt. ##57-6, 57-7).)

OPINION

Plaintiffs bring claims under Title II of the ADA and Section 504 of the Rehabilitation Act. They also assert claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment. Pending before the court are

plaintiffs' motion for summary judgment on their ADA and Rehabilitation Act claims and defendants motion for summary judgment on all claims.

## I. Proper Defendants

As an initial matter, defendants argue that they cannot be held liable for any of the violations under the claims as alleged. DPI and its Superintendent Evers contend that they cannot be held liable for the decisions of individual school districts under the open enrollment law. In particular, they argue that DPI's role is limited to administering the law as written. DPI does not process or review applications, and it has no authority to approve or deny applications; rather, its role is limited to deciding appeals, which involve whether a school board's decision was arbitrary or unreasonable.

In response, plaintiffs contend that the two state defendants can be liable for simply administering the law, as "state proxies" for the entities who enacted the law. *See Goodvine v. Gorske*, No. 06-C-0862, 2008 WL 269126, at *5 (E.D. Wis. Jan. 30, 2008) (explaining that the state agencies and officials who run those agencies stand in as "proxies of the state" in defending against ADA and Section 504 claims); *Lister v. Bd. of Regents of Univ. Wis. Sys.*, 72 Wis. 2d 282, 303, 240 N.W.2d 610, 623 (1976) (actions challenging a Wisconsin state statute are appropriately brought against "the officer or agency charged with administering the statute"). Consistent with plaintiff's argument, the court agrees that DPI and Evers can be held liable, but only if plaintiffs are successful in demonstrating a facial, as opposed to individual, as-applied challenges to the statute, *or* the state defendants are involved in an appeal of the individual school district's denial.

Second, the school district defendants argue that they are simply following a state statute, so they cannot be held liable. Judge Crabb previously considered a similar challenge to another provision of the open enrollment law, one requiring the consideration of race in reviewing applications. *N.N. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927 (W.D. Wis. 2009). In that case the defendant school district effectively conceded that the provision was unconstitutional in light of the Supreme Court's decision in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), holding that school districts violated the equal protection clause by using a student's race in determining placement at a particular school. Nonetheless, the court granted summary judgment to the school district, holding that it could not be held liable under § 1983 for instituting a policy *mandated* by state statute. *N.N.*, 670 F. Supp. 2d at 941.

In so holding, Judge Crabb described the standard of municipal liability when a state or federal policy is implicated: "a municipality cannot be liable under section 1983 for acts that it did under the *command* of state or federal law." *Id.* at 936 (citing *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998)). This holding closely tracked the Seventh Circuit explanation in *Bethesda Lutheran* that:

> The plaintiff who wants a judgment against the municipality under that statute must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself. When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury.

154 F.3d at 718.

In *N.N.*, however, the challenged provision of the open enrollment law *mandated* rejection of an application of transfer into a non-resident application if it would increase racial imbalance in the resident school district. *N.N.*, 670 F. Supp. 2d at 930 (quoting Wis. Stat. § 118.51(7) ("The school board . . . *shall* reject . . . ." (emphasis added)).) Here, the challenged provision simply sets forth permissible criteria for rejecting applications but does not require the non-resident school board to reject applications on this basis or in a way that would violate federal anti-discrimination law. As such, the court finds *N.N.* distinguishable, and further finds that the discretion expressly extended to non-resident school districts in weighing the statutory factors for acceptance or rejection of applications by students with special education needs may open them up to municipal liability.

## II. Title II ADA and Section 504 Rehabilitation Act Claims

### A. Facial Challenge

Title II of the ADA prohibits discrimination in services furnished by public entities on the basis of disability. *See* 42 U.S.C. § 12131 *et seq.* Specifically, Title II provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

Consistent with this parallel language, the requirements of equal treatment under both acts are essentially the same, with the minor exception being that Section 504 of the Rehabilitation Act only applies to entities receiving federal funding. *See, e.g., Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) ("The Rehabilitation Act claim is functionally identical[.]"); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) ("We have held previously that the standards applicable to one act are applicable to the other. Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other.").[4] All defendants have admitted that they received federal funding. (*See* Pls.' PFOFs (dkt. #34) ¶ 32.) To prove a claim here under Title II or Section 504, therefore, a plaintiff must demonstrate: (1) she is a "qualified individual with a disability;" (2) she was excluded from benefits or services or otherwise discriminated against; and (3) such exclusion, denial of benefits or discrimination was because of her disability. *See Wagoner*, 778 F.3d at 592.

---

[4] From the plain language of the statutes, one *could* argue that there is another distinction: Section 504 prohibits exclusion or denial of benefits "solely by reason of" disability, whereas Title II prohibits exclusion or denial of benefits "by reason of" disability. *See Washington*, 181 F.3d at 845 n.6 ("Another difference is that the Rehabilitation Act requires that the exclusion be solely by reason of disability, while the ADA requires only that the exclusion be by reason of the disability."). Regardless of this difference in language, however, both claims require a showing of "because of" or "but for" causation.

Taking the most straightforward element out of order, there is no dispute with respect to the *second* that plaintiffs were excluded from participating in the open enrollment program. Plaintiffs anticipate an argument that the open enrollment law is not a program, but defendants do not pursue this defense, and for good reason. "Program" is defined broadly to encompass a wide range of actions on the part of public entities, and the term has specifically been applied in the educational setting. (*See* Pl.'s Opening Br. (dkt. #33) 18.) Moreover, at least under the ADA, the alleged violation need not be exclusion from a program; the Act also covers individuals "subjected to discrimination" more generally. *See Brewer v. Wis. Bd. of Bar Examiners*, No. 04-C-0694, 2006 WL 3469598, at *5 (E.D. Wis. Nov. 28, 2006) ("The language of the statute is disjunctive; it prohibits exclusion from participation, denial of benefits, *or* discrimination against be reason of disability.").

Instead, the parties' dispute plaintiffs' proof as to the other two elements of the claim. As for the *first*, Title II defines "qualified individual with a disability" as

> an individual with a disability who, *with or without reasonable modifications* to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential eligibility requirements* for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131 (emphasis added). With the exception of plaintiff S.B. (the student with ADHD, whose parent withdrew the IEP), it appears that defendants do not dispute that the plaintiffs -- all diagnosed with autism -- have a disability. Instead, the focus of defendants' challenge is on whether plaintiffs are "qualified," and specifically whether

they meet "the essential eligibility requirements." Similarly, with respect to the *third* element, the parties dispute whether plaintiffs' open enrollment applications were denied because of their disability or because of a legitimate, non-discriminatory reason concerning the availability of space.

Plaintiffs contend that the sole eligibility requirement is that "the person be a student and that the student's resident school district offers the same type of program that the student seeks to attend in the non-resident school district." (Pl.'s Opening Br. (dkt. #33) 15 (citing Wis. Stat. § 118.51(2)).)[5] On the other hand, defendants contend that the eligibility requirements also encompass the non-resident district's availability of space, including space for children with special education needs. From this, defendants reason that they are not denying spots because the children are disabled, but rather because the districts do not have available special education space. Using defendants' logic, however, one could also argue that a person in a wheelchair is not denied access to a building because of her disability, but rather because the building lacks handicapped-accessible ramps.

Stated another way, the problem with defendants' argument is that the law could be read as contemplating two different, discrete types of space -- one for "general education" and one for "special education." As such, children with disabilities are treated differently because the availability of space is treated differently. As plaintiffs argue in

---

[5] In the "applicability" section, the requirement that the student's resident district must provide the same program as that in the non-resident district appears limited to "prekindergarten, 4-year-old kindergarten, or early childhood or school-operated child care program." Wis. Stat. § 118.51(2). Regardless, plaintiffs disavow any attempt to enroll in a program that is not available in their resident school districts.

reply, treating space for special education as an eligibility requirement could create a dual system -- one for children without a disability and one for children with a disability -- which the ADA and Rehabilitation Act were expressly enacted to prevent. *See* 28 C.F.R. § 35.130(b)(6) (prohibiting public agencies from establishing requirements for programs or activities "that subject qualified individuals with disabilities to discrimination on the basis of disability").

Accordingly, the court agrees with plaintiffs that categorizing children and making decisions on eligibility under Wisconsin's open enrollment law solely based on whether they have an IEP is problematic at best. The educational needs of children with IEPs vary broadly. For example, some children may spend *all* of their time in a general education population, with the only modification being extra time to take tests; while other children may spend most of their time in a general education classroom, with limited pull-out time for special instruction or therapy; still other children may, of course, require instruction wholly outside of a general education classroom for a significant portion of the school day, with more limited inclusion opportunities (for example, for music or art); of course, other children may attend a school that only serves children with disabilities. Here, the concept of separate space for children with IEPs necessarily generalizes across that broad array of children with disabilities, a problem that is present under both the ADA / Rehabilitation Act.

At the hearing, however, defendants (particularly counsel for the State and Evers) argued for an interpretation of the statute that requires the school districts to perform a more nuanced analysis of the availability of space for non-resident students. Under the

statute and accompanying regulations, counsel specifically explained that each school district is tasked with assessing the availability of space as it pertains to specific services or specialized teachers or other providers (*e.g.*, number of children that a hearing counselor or speech pathologist can serve, or the number of spots available in a specialized autism program). Under defendants' interpretation of the statute and accompanying regulations, therefore, space is not assessed based on broad generalizations about the educational needs of children with IEPs, rather, it based on a specific, practical assessment of the needs of the child and the capacity of the school district. Accepting this reasonable interpretation of the law to avoid a conflict with federal requirements, the question remains whether the Open Enrollment Law still violates the ADA and Rehabilitation Act.

To further their respective positions, the parties point to other education-related cases considering discrimination claims, but for various reasons, the facts of those cases do not fit the challenge presented here very well. Some cases concern a disabled student's request for an accommodation with respect to a program that on its face treats all students the same. *See, e.g.*, *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999) (holding that the disabled plaintiff's requested modifications to a medical school program were not reasonable modifications). Other cases involve challenges to programs only available to the disabled. *See, e.g.*, *Mallett v. Wis. Div. of Vocational Rehab.*, 130 F.3d 1245, 1257 (7th Cir. 1997) (rejecting plaintiff's Rehabilitation Act claim because the plaintiff could not show that a non-handicapped person "received the treatment denied to the 'otherwise qualified' handicapped").

Here, plaintiffs challenge a system that on its face treats children with IEPs differently. In the court's review, cases concerning whether a school district can treat disabled athletes differently than other athletes provide the closest analogy. In those cases, courts have affirmed differential treatment because it is tied to some legitimate reason separate from inappropriate generalizations about disabilities. *See, e.g.*, *McFadden v. Grasmick*, 485 F. Supp. 2d 642, 651 (D. Md. 2007) (wheelchair-bound plaintiff unlikely to prevail on the merits of challenge to be allowed to compete with non-wheelchair athletes); *Badgett ex rel. Badgett v. Ala. High Sch. Athletic Ass'n*, No. 2:07-CV-00572-KOB, 2007 WL 2461928, at *5 (N.D. Ala. May 3, 2007) (wheelchair bound student athlete's request to be allowed to compete with non-wheelchair student athletes did not constitute a reasonable modification under the ADA and Rehabilitation Act). In the context of high school athletics, for example, courts have upheld track programs that treat children competing in wheelchairs different than those not competing in wheelchairs. The courts found that the dual system made sense in light of safety and competitiveness concerns, and that the proposed modification -- upending that dual system -- would fundamentally alter the program. *Badgett*, 2007 WL 2461928, at *5-6.

Nevertheless, plaintiffs persist that a non-resident school district must evaluate eligibility and accept children without *any* regard to disability. For example, plaintiffs' counsel argued at the hearing that while there are two figurative doors into a school -- one for resident children and one for non-resident children -- a school is under the same obligation to educate disabled children outside of its district as it is required to educate children residing in its district. This argument, however, imposes an IDEA requirement

of a "free appropriate public education," 20 U.S.C. §§ 1400, 1412, on a non-resident school district. There is *no* support for this premise in the law. No doubt, if one of the plaintiffs were to move into a district that did not have available space or services to meet the needs of that child, the district would have to take the necessary steps -- regardless of whether the modifications to that school's space and services were reasonable -- to ensure that the requirements of IDEA are met. In contrast, the ADA and Rehabilitation Act do not require the *same* steps.[6] Instead, true to the laws at issue in this lawsuit, the defendants, as non-resident school districts, are required to "make reasonable modifications" to avoid "discrimination on the basis of disability," but are not required to take measures that would "fundamentally alter" the nature of the entity's programs. 28 C.F.R. § 35.130(b)(7).

Therefore, the court finds that: (1) that Wisconsin's Open Enrollment Law can be applied in such a way as to avoid generalizations about children with disabilities, divorced from actual educational service and space needs; and (2) consideration of the availability of space serves a legitimate, non-discriminatory purpose. For those reasons, the court also concludes that plaintiffs' facial challenge to Wisconsin's Open Enrollment Law, Wis. Stat. § 118.51, fails as a matter of law.[7]

---

[6] Whether a disability-blind admission process -- like that embraced by the State of Minnesota -- would make sense from a policy perspective is another question, one which appears left to the Legislature, at least under current law.

[7] If school districts find it too taxing to assess available capacity and determine eligibility in a way that complies with the requirements of the ADA and Rehabilitation Act, the state could opt to simply do away with the open enrollment program for all students.

### B. As Applied Challenges

Having rejected a facial challenge to § 118.51, the court must still consider whether any of the individual plaintiffs have put forth sufficient evidence to raise a genuine issue of material fact challenging an individual school district's treatment of his or her application under the open enrollment law. As set forth above, to prevail on an "as applied" challenge, a plaintiff must demonstrate that: (1) she is a "qualified individual with a disability;" (2) she was excluded from benefits or services or otherwise discriminated against; and (3) such exclusion, denial of benefits or discrimination was because of her disability. *See Wagoner*, 778 F.3d at 592. This inquiry necessarily encompasses whether each plaintiff's unique educational needs constituted a reasonable modification.

#### i. R.W.

As described above, the Paris School District rejected plaintiff R.W.'s application because it would have had to hire a part-time special education teacher and a part-time aide to work with him on a one-on-one basis, plus contract for occupational therapy services. Moreover, R.W.'s IEP concluded that he should be placed in a "kindergarten classroom that is collaboratively taught by a general education and special education teacher." (Gahart Decl., Ex. E (dkt. #77-5) 9.) Likely because of its relatively small size, the Paris School District does not appear to have had a collaborative classroom. Despite these additional demands on a small school district appearing to be quite burdensome, the record is not sufficiently developed to determine whether a reasonable fact finder could conclude that the modifications are not reasonable, either from a financial,

classroom or management perspective, or for some other reason. *See Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) ([T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it.'"). As such, the court concludes that plaintiff R.W.'s as-applied challenge should proceed to trial.

The next question is whether that trial should be to a jury or the bench. Plaintiffs made no jury demand, but defendant Paris School District did. If the only relief available is equitable, however, neither side has a right to a jury trial. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 966 (7th Cir. 2004) ("There is no right to a jury where the only remedies sought (or available) are equitable."); Fed. R. Civ. P. 39(a)(2) ("The trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.").

Because Title II of the ADA and Section 504 of the Rehabilitation Act both provide for damages, there is no sovereign immunity bar to monetary damages. *See Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F. 3d 906, 912 (7th Cir. 2003). Plaintiffs acknowledge, however, that damages are only available if they demonstrate intentional discrimination. (Pls.' Reply (dkt. #91) 21 (citing *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007)).) Under both statutes, there is a circuit split as to what constitutes intentional discrimination, and the Seventh Circuit has yet to weigh in on this issue. Still, the Second, Third, Eighth, Ninth, Tenth and Eleventh

Circuits have all adopted a "deliberate indifference" standard, which the Ninth Circuit articulated as requiring "both knowledge that a harm to a federally protected right is substantially likely" and "a failure to act upon that likelihood." (Pls.' Reply (dkt. #91) 23 (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001)).) *See also* 7th Cir. Civil Jury Instructions § 7.14, *available at* http://www.ca7.uscourts.gov/Pattern_Jury_Instr/7th_cir_civil_instructions.pdf (defining deliberate indifference in the Eighth Amendment context). In contrast, the First and Fifth Circuits require a showing of "discriminatory animus." (State Defs.' Opening Br. & Opp'n (dkt. #87) 47.)

The court need not guess as to which side the Seventh Circuit, or ultimately the Supreme Court, will come out on this split in authority, given that R.W. has no realistic claim to monetary damages under either standard. Certainly, there is nothing in the record to support a finding of discriminatory animus on the part of defendant the Paris School District. Admittedly, evaluating plaintiff's demand under the lower standard of deliberate indifference proves a closer question, but only *relatively* so, since the deliberate indifference standard is still a taxing one, requiring more than negligence. *See S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) ("[D]eliberate indifference must be a 'deliberate choice, rather than negligence or bureaucratic inaction." (internal citation and quotation marks omitted)).

The record at summary judgment shows that the Paris School District treated R.W.'s application with care, initiating a process to secure an IEP for him *and* considering his educational needs in light of the available services and space configurations of the

one-school district. While Paris's apparent failure to consider explicitly whether implementing R.W.'s specific plan would prove a reasonable modification or whether its refusal to implement the plan might violate the ADA and Rehabilitation Act, no reasonable trier of fact could find on this record that Paris was deliberately indifferent to R.W.'s rights. Accordingly, even if R.W. is successful in demonstrating a violation of the ADA and Rehabilitation Act, his only available remedies are equitable in nature. Accordingly, R.W.'s claim will proceed to a trial to the bench.

### ii. P.F.

While the letter rejecting P.F.'s application stated that his application was rejected because of a lack of space "in the special education or related services required in your child's individual education program (IEP)," the undisputed facts also establish that the application was rejected because P.F.'s *resident* district (the Racine Unified School District) rejected the transfer due to cost considerations. As such, a reasonable fact finder could not conclude that but for P.F.'s disability, defendant Muskego-Norway School District would have accepted his application. In other words, an intervening act by a non-party, the Racine School District, broke the causal link.

### iii. S.W.

As for S.W., the undisputed facts demonstrate that his application was denied in error. Indeed, the school district's own, contemporaneous records show that it intended to accept all students, regardless of whether they had an IEP or not. As a result, no

reasonable jury could find that S.W.'s application was rejected because of his disability; rather, it was rejected because of an administrative error.[8]

### iv.   S.B.

As for S.B., other than his diagnosis of ADHD, plaintiff failed to put forth any evidence to demonstrate that he is even disabled and, therefore, entitled to the protections of the ADA and Rehabilitation Act.[9]  To demonstrate that he is disabled, S.B. must show that he is substantially limited in a major life activity.    42 U.S.C. § 12102(1)(A).  Case law is mixed as to whether individuals with ADHD are disabled, suggesting that consideration of an individual's specific limitations are necessary. *Compare Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) (finding that ADHD diagnosis "does not substantially limit his abilities to read, learn, concentrate, and think, as compared to the general population"), *with Peters v. Univ. of Cincinnati Coll. of Med.*, No. 1:10-CV-906, 2012 WL 3878601, at *6-7 (S.D. Ohio Sept. 6, 2012) (finding plaintiff disabled due to ADD).

Here, S.B.'s mother simply avers that S.B. was diagnosed with ADHD, with no any description of how (nor how much) this diagnosis impacts his learning or life activities.  If anything, the record reflects that S.B.'s ADHD diagnosis is *not* a disability.

---

[8] Even if there were *some* arguable factual dispute on the reason(s) for this administrative snafu, *no* reasonable jury could not find intentional discrimination on this record for purposes of assessing damages, and any equitable relief is moot in light of Elkhorn's repeated offers to enroll S.W.

[9] Plaintiff also challenges S.B.'s standing to bring this claim on the basis that his claim is moot because the denial was reversed on appeal.  (Shorewood's Br. (dkt. #62) 3.)  As described above, there appears to be a factual dispute as to whether Shorewood had adequately communicated S.B.'s acceptance.  As such, the court will deny the motion to dismiss for lack of subject matter jurisdiction.

Specifically, his mother withdrew her consent for S.B. to receive special education and related services, and DPI concluded that S.B. is "no longer entitled to receive special education." (Nicholas Decl., Ex. C (dkt. #67-3).) On this record, the court concludes that a reasonable jury could not find that S.B. meets the threshold requirements of the ADA and Rehabilitation Act. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (describing summary judgment as the time when the party with the burden of proof at trial must "'put up or shut up,' when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quoting *Schnacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

####        v.    Ca.R. and Ch.R.

As for sisters Ca.R. and Ch.R., the record demonstrates that they were denied enrollment because of a lack of space in their respective grades and not because of a disability. Specifically, the undisputed facts show that the Greendale School District determined it had *no* space available in the fifth and seventh grades well before Ca.R. and Ch.R. had even applied for open enrollment. As such, even though the rejection letter referenced the lack of space in the special education programs, the lack of overall space in the sisters' respective grades serves as an *independent* basis for rejecting their applications. As such, the court concludes that no reasonable jury could find that their respective applications would have been accepted but for their disabilities.

## III. Equal Protection Claim

Plaintiffs do not move for summary judgment on their equal protection claim, but defendants do. First, defendants argue that plaintiffs' equal protection claims should be dismissed because the ADA and Rehabilitation Act claims are comprehensive and, therefore, § 1983 cannot be used "to expand or supplant the [Act's] comprehensive remedial scheme." *Sneed v. City of Harvey, Ill.*, No. 14-1125, 2015 WL 151715, at *3 n.1, 598 F. App'x 442, 446 n.1 (7th Cir. Jan. 13, 2015). Nevertheless, because the case law in support of this argument appears limited, this court is generally disinclined to bar constitutional claims to proceed in parallel to statutory clams (*e.g.*, equal protection claim based on race discrimination and Title VII). Regardless, the court need not fully resolve this basis for dismissal.

This leaves defendants' challenge to plaintiffs' equal protection claims on the merits. Defendants argue that plaintiffs are not similarly situated to non-disabled students, and the open enrollment law is rationally related to a legitimate government interest. *See United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999) (applying rational basis review to claim premised on alleged disabilities); *Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013) (applying rational basis review to education-related claims). In opposing defendants' motions for summary judgment on this claim, plaintiffs primarily rely on the fact that the program is cost neutral.

Beginning with the 2016-2017 academic year, however, the open enrollment program is no longer cost neutral, having capped the amount a nonresident school district can receive at $12,000. Even if the program were still cost neutral, moreover,

there are other intangible costs associated with a non-resident school district serving the needs of a disabled child. Allowing school districts to consider space and resource needs unique to a disabled child in determining whether to accept non-resident applications is rationally related to a legitimate government interest, namely the efficient management of the state's school districts. *See Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (explaining that a plaintiff must demonstrate that the differential treatment was not reasonably related to a legitimate state interest to prove an equal protection violation). As such, plaintiffs' equal protection claims may not proceed.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for summary judgment (dkt. #32) IS DENIED.

2) Defendants Tony Evers and State of Wisconsin Department of Public Instruction's motion for summary judgment (dkt. #48) is GRANTED. The clerk of court is directed to enter judgment in favor of these state defendants and terminate them as parties in this case.

3) Defendant Elkhorn School District's motion for summary judgment (dkt. #45) is GRANTED. The clerk of court is directed to enter judgment in favor of Elkhorn School District and terminate it as a party in this case.

4) Defendant Greendale School District's motion for summary judgment (dkt. #55) is GRANTED. The clerk of court is directed to enter judgment in favor of Greendale School District and terminate it as a party in this case.

5) Defendant Shorewood School District's motion to dismiss for lack of jurisdiction, or for summary judgment dismissing plaintiffs' claims (dkt. #61) is GRANTED IN PART AND DENIED IN PART. The motion to dismiss is denied; the motion for summary judgment is granted. The clerk of court is directed to enter judgment in favor of Shorewood School District and terminate it as a party in this case.

6) Defendants Muskego-Norway School District and Paris School District's motion for summary judgment (dkt. #73) is GRANTED IN PART AND DENIED IN PART. The motion is granted as to claims asserted against Muskego-Norway. The clerk of court is directed to enter judgment in favor of Muskego-Norway School District and terminate it as a party in this case. The motion is also granted with respect to plaintiffs' Equal Protection claim and any claim for damages under the ADA and Rehabilitation Act asserted against the Paris School District. In all other respects, Paris's motion is denied.

7) With respect to plaintiff R.W.'s remaining claim for injunctive relief against defendant Paris School District, the court will hold a scheduling conference on October 11, 2017, at 10:00 a.m. to establish pretrial deadlines and set this case for an expedited bench trial in December 2017. Plaintiff's counsel shall initiate the call to the court.

Entered this 3rd day of October, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge